Velis, J.
Defendants, Lawrence Dubois and other officials within the Massachusetts Department of Corrections (“DOC”) seek dismissal of plaintiffs’ motions for contempt of court.[1] Plaintiffs are Randall Shieldwolf Trapp (“Trapp”) and William Wiyakaska a/k/a William Whitefeather Durfee (“Wiyakaska”). Plaintiffs allege defendants are in contempt of a court order issued on May 4, 2000 (Toomey, J.) regarding plaintiffs rights to possess certain religious items.[2] Defendants contend they are not in contempt of Judge Toomey’s order, alleging that the necklace taken from Trapp and the necklace kit sought by Wiyakaska are not within the scope of Judge Toomey’s order, and that the plaintiffs have not exhausted their administrative remedies pursuant to G.L.c. 127, §38F and 42 U.S.C. §1997e(a) (1996) as interpreted by Porter v. Nussle, 534 U.S. 516 (2002).[3] For the following reasons, defendants’ motion to dismiss plaintiffs’ motions for contempt of court is ALLOWED.

*616
BACKGROUND

On April 12, 1995 Trapp and Wiyakaska were among a group of seven (7) plaintiffs[4] incarcerated at North Central Correction Institution in Gardner, Massachusetts (“NCCI-Gardner”) who brought a complaint against the DOC for violations of the First Amendment to the United States Constitution regarding the inmates’ free exercise of religion. Plaintiffs prayed the court: “(1) issue an order of notice to the defendants to show cause within 10 days why this relief should not be granted; (2) issue a preliminary injunction pending trial on the merits enjoining the defendants from interfering with plaintiffs’ possession of ceremonial items and return to plaintiffs all ceremonial items previously seized; (3) issue a preliminary injunction pending trial on the merits enjoining the defendants from establishing any criteria regarding membership in and of plaintiffs’ Native American Spiritual Awareness Council; (4) enter a declaratory judgment that the defendants must make available to the plaintiffs an area for the construction of a sweat lodge and the means to construct said structure; (5) issue judgment against the defendants in their official capacity as agents of the Department of Corrections of the Commonwealth of Massachusetts, and personally for compensatory damages and costs; (6) issue judgment for punitive damages against the defendants individually; (7) enjoin the defendants from interfering with the plaintiffs’ possession of ceremonial items and return to plaintiffs all ceremonial items previously seized; (8) enjoin the defendants from establishing any criteria regarding membership in and of plaintiffs Native American Spiritual Awareness Council; (9) award reasonable attorneys fees to their attorneys pursuant to M.G.L.c. 93, §102, M.G.L.c. 12, §11 and 42 U.S.C. 1988; and (10) that the court grant such other and further relief as-it deems just and equitable in this matter.”
On April 12, 1995 plaintiffs moved for a preliminary injunction. After a hearing and by agreement of the parties Judge Kottmyer granted a preliminary injunction on May 12, 1995. In relevant part, she stated: “Defendants ... shall permit the use of headbands by plaintiffs ... as part of the ceremonial items used by members of the Circle. Headbands shall be treated similarly to all other sacred items for purposes of handling and storage. Defendants shall permit, absent specific security concerns, individual inmates future participation in the Native American Spiritual Awareness Council. Such participation shall be subject to the approval of an outside spiritual advisor or sachem. The Plaintiffs, individually, shall have unlimited correspondence as per 103 C.M.R. 481.09 and 103 C.M.R. 481.10 and the Native American Spiritual Awareness Council shall be permitted to purchase stamps through the canteen, subject to the group’s budget.”
On October 10,1995 plaintiffs moved that DOC was in contempt of the preliminary injunction. On October 20, 1995 Judge Kottmyer denied plaintiffs’ motion for contempt stating: “Parties have reached agreement as to authorization for purchase of items traditionally used in ceremonies held in institution.” On November 3, 1995 plaintiffs moved for partial summary judgment. On February 26, 1996 Judge Travers denied the motion stating there were genuine issues of material fact. He also stated DOC had proffered evidence that might show at trial that the state’s regulations served a compelling state interest and were the least restrictive means of serving that interest.
On August 12, 1997 plaintiffs moved for summary judgment and to amend the complaint. As there was no opposition pursuant to Rule 9(a), plaintiffs’ motion to amend complaint was allowed on August 27, 1997. According to the docket plaintiffs never filed an amended complaint. On February 27, 1998 Judge Bohn denied plaintiffs’ motion for summary judgment.
On December 14, 1999 a bench trial commenced. After hearing testimony, receiving documentary evidence and memoranda of law in lieu of closing arguments, on May 4, 2000 Judge Toomey ordered that “judgment shall enter, upon prayers (1), (2), and (3), in accordance with the injunctive relief heretofore granted by the court; judgment shall enter, upon prayers (4), (5), (6), (9), and (10), for defendants for the reasons stated supra; and judgment shall enter, upon prayers (7) and (8), in accordance with injunctive relief heretofore granted by this court.”
On June 17, 2002 plaintiff Trapp moved that DOC was in contempt of Judge Toomey’s order of May 4, 2000 by confiscating his animal tooth necklace. The necklace taken from plaintiff Trapp on May 31, 2002 was twenly-four inches (24") long, with different colored beads, including red and blue, and a black stone pendant hanging from the necklace. Plaintiff Trapp had this necklace in his possession when he returned from Southeastern Correctional Institution in Bridgewater on May 21, 2002.
On July 8, 2002 plaintiff Wiyakaska moved that DOC was in contempt of Judge Toomey’s order of May 4, 2000 by refusing to authorize the purchase of a three-tier necklace kit. On March 23,2002 Wiyakaska had submitted an Inmate Religious Services Request Form with an attached drawing and description of a three-tiered necklace. The necklace had a leather thong, leather choker spacers (2" x V2" x V4"), glass crow beads in either red, white, black, or brown (V4"), black buffalo horn or white or brown hairpipe beads (1/2" x F'-IW x Vi"), a disc of conch or abalone (2"), and either two ermine tails (2’-4"), two wolf, coyote, or porcupine teeth (2"-2W), or two black bear claws (1"-IV2") dangling from the disc.[5]
On May 22, 2002 Wiyakaska had submitted a Property Permission Form requesting a three-tier necklace kit. P.J. Chalapatas, Director of Treatment at NCCI-Gardner denied Wiyakaska’s request on May 30, 2002 stating: “Your request for a kit to make a *617 three-tiered necklace was denied by Property on the fact that kits are not allowed. I would like to reconsider your request only if you provide me with the specifics on this kit. I need the page of the catalog, along with the description of the contents of this kit.”
Under G.L.c. 124, §§l(b), (c) and (q), and G.L.c. 127, §§3, 96A and 96B, the DOC is authorized to promulgate regulations, found at 103 C.M.R. 403.00 et seq., regarding the religious items inmates may keep on their person. Pursuant to those regulations, the DOC distributes a list of approved on-person religious items to all superintendents.[6] The list is organized by approved religion and by the security level of the prison.[7] It is amended as needed. On December 1, 2000 the Superintendent at NCCI-Gardner received a memorandum from James Bender, Assistant Deputy Commissioner of DOC updating the list.[8] According to his memorandum, animal tooth necklaces were an approved on-person religious item, but they needed to be “20" max. length; beads W max. diameter and solid color, black, brown or white. Necklace shall consist of no more than three tiers of beads."[9]
On July 29, 2002 John Marshall, Jr., Assistant Deputy Commissioner of DOC issued another update to the list of approved on-person religious items. This update amended the requirements for an animal tooth necklace by adding the following sentence; “Animal tooth necklaces can either be constructed through the use of a kit or come in their complete form from the approved vendors.”[10]
“The Religious Services Handbook . . . [is] a reference tool to assist administrators when evaluating inmate religious requests . . . [It] includes procedures . . . [to] be utilized when processing requests for religious items ... not addressed in the Religious Services Handbook.”[11] When requesting a non-approved religious item an inmate must fill out a Religious Service Request Form.[12] That form is given to the Superintendent of the facility where the inmate is incarcerated. The Superintendent fills out a Religious Services Request Form, containing his recommendation regarding the inmate’s request.[13] Both forms are forwarded to the Religious Services Review Committee (“RSRC"), which consists of the Assistant Deputy Commissioner of the Bridgewater Complex, the Assistant Deputy Commissioner of Community Corrections, the Assistant Deputy Commissioner of Secure Facilities, the Director of Offender Management and Placement, and the Director of Program Services.[14] The RSRC reviews the forms and makes a formal determination on the inmate’s request. A copy of the inmate’s request and the formal determination is placed in the inmate’s six-part folder.[15]
Under G.L.c. 124, §l(i) and (q) and G.L.c. 127, §38E the DOC is authorized to promulgate regulations, found under 103 C.M.R. 491.00 et seq., regarding inmate grievances. If a religious item is taken from an inmate and the inmate believes it is an approved on-person religious item, the inmate may try to informally resolve the problem,[16] or may fill out a grievance form which is readily available throughout the institution. [17] After receiving the grievance form, the Institutional Grievance Coordinator (“IGC”) signs, date-stamps, and numbers each grievance received.[18]
The IGC acknowledges receipt of the inmate’s grievance form in writing to the inmate. The IGC investigates the grievance and proposes a resolution or denies the grievance within ten (10) working days of its receipt.[19] The IGC keeps a grievance log of all grievances filed by inmates.[20]
Debra LaPrade is the IGC at NCCI-Gardner.[21] She has served in this capacity since September 2000. Her responsibilities include those listed above.[22] The grievance log for NCCI-Gardner does not show that plaintiff Trapp filed any grievances between May 31, 2002, when his animal tooth necklace was confiscated, and June 14, 2002 when he filed his Motion for Contempt of Court.[23]
On July 22, 2002 DOC moved to dismiss Trapp’s and Wiyakaska’s complaints. On September 27, 2002 a hearing was held with all parties present and represented by counsel.

DISCUSSION

Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).

Judge Toomey’s Order

DOC contends that the animal tooth necklace taken from Trapp and the necklace kit sought by Wiyakaska are not within the scope of Judge Toomey’s order of May 4, 2000. Judge Toomey denied judgment for the plaintiffs on prayers (4), (5), (6), (9), and (10) and granted judgment for the plaintiffs in accordance with injunctive relief heretofore granted by the court on prayers (1), (2), (3), (7), and (8). As the docket reflects no filing of an amended complaint by the plaintiffs, the court assumes that Judge Toomey’s order is referring to plaintiffs’ prayers in plaintiffs’ original complaint filed April 12, 1995. Plaintiffs’ prayer (1) asked defen *618 dants to show cause within ten (10) days why relief should not be granted. It addressed a procedural issue. Therefore, the judgment relating to prayer (1) is not relevant to the issue currently before the court. Prayer (2) asked for a preliminary injunction regarding the plaintiffs’ possession of ceremonial items and return of plaintiffs’ ceremonial items already seized by the defendants, and prayer (7) asked for a permanent injunction regarding the same issues. The judgments relating to these prayers are relevant to the issue before the court. Prayer (3) asked for a preliminary injunction regarding the defendants’ establishment of criteria for membership in NASAC, and prayer (8) asked for a permanent injunction regarding the same issue. The judgments relating to these three prayers are not relevant to the issue currently before the court.
Therefore, the court need only address Judge Toomey’s order in relation to the plaintiffs’ prayers (2) and (7). The order stated that judgments should enter in accordance with injunctive relief already granted by the court. The only injunction on the record is Judge Kottmyer’s order for preliminary injunction of May 2, 1995. Only paragraph (1) of the injunction addresses in anyway the plaintiffs’ use of ceremonial items. The other two paragraphs of the injunction address requirements for membership in NASAC and plaintiffs rights to unlimited correspondence and NASAC’.s rights to purchase stamps. The only ceremonial item referenced in paragraph (1) of the injunction is headbands. Paragraph (1) states: “Defendants . . . shall permit the use of headbands by plaintiffs Randall Sheildwolf Trapp [and] William Whitefeather Durfee ... as part of the ceremonial items used by members of the Circle. Headbands shall be treated similarly to all other sacred items for purposes of handling and storage.” Thus, the injunctive relief heretofore granted by the court pertains to headbands. It does not pertain to animal tooth necklaces. Therefore, the confiscation of plaintiff Trapp’s animal tooth necklace and the denial of plaintiff Wiyakaska’s request for an animal tooth necklace kit are not within the scope of Judge Toomey’s order of May 4, 2000.

DOC Regulations and Policies Regarding Approved On-Person Religious Items

While plaintiff Trapp’s necklace is not within the scope of Judge Toomey’s order of May 4, 2000, it is within the scope of the DOC’s regulations regarding approved on-person religious items. It did not conform to the requirements for an approved animal tooth necklace. Plaintiff Trapp’s necklace was twenty-four inches (24") long, four inches (4") longer than the twenty inch (20") maximum length of approved necklaces. Plaintiff Trapp’s necklace had different colored beads, including red and blue, whereas the beads on approved necklaces had to be all one color, with the color being either brown, black, or white. Therefore, plaintiff Trapp’s necklace is not an approved animal tooth necklace, and the DOC appropriately confiscated the necklace.
Similarly, plaintiff Wiyakaska’s request for a kit to make an animal tooth necklace is not within the scope of Judge Toomey’s order of May 4, 2000 but is within the scope of the DOC’s regulations regarding approved on-person religious items. The necklace that Wiyakaska described making from the kit does not conform to the requirements for an approved animal tooth necklace. It had three kinds of beads, leather choker spacers (2" x V2" x Vf'), black buffalo horn or white or brown hairpipe beads (V2" x 1 -1V2" x W), and a disc of conch or abalone 2" in diameter. Approved necklaces have beads of one color, no more than W in diameter. Therefore, it is not an approved necklace, and it was appropriate for the DOC not to authorize the kit’s purchase.

Exhaustion of Administrative Remedies

According to the Prison Litigation Reform Act (“PLRA”) a prisoner must exhaust all administrative remedies before bringing a suit in court with respect to “prison conditions under section 1983 of this title, or any other Federal law.” 42 U.S.C. 1997e(a) (1996). A recent Supreme Court decision extended the “exhaustion requirement... to all suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.” Porter v. Nussle, 534 U.S. 516, 525 (2002). Furthermore, the exhaustion requirement applies even when the prisoner is seeking relief not available in a grievance proceeding, i.e., money damages. Id. at 521. A Massachusetts Superior Court decision recently found the exhaustion requirement applies to §1983 claims brought only in state courts, not only to claims brought in federal courts or to claims brought both in federal and state courts. Megna v. Correctional Medical Services, Inc., Civil No. 02-1403H (Suffolk Super.Ct. 2002) (Troy, J.) (15 Mass. L. Rptr. 58).
Plaintiffs Trapp and Wiyakaska needed to exhaust all administrative remedies within the DOC regarding their right to possess animal tooth necklaces before bringing suit in state court. Since plaintiff Wiyakaska was requesting a non-approved religious item, he needed to fill out a Religious Services Request Form, which he did on March 23, 2002. It is unclear from the record before the court if the RSRC reviewed his request and made a formal determination about it. Therefore, the court cannot determine if plaintiff Wiyakaska exhausted his administrative remedies before bringing suit in court.
Since plaintiff Trapp’s animal tooth necklace was confiscated as a non-approved on-person religious item, he needed to informally resolve the problem or fill out a grievance form. Debra LaPrade is the IGC at NCCI-Gardner with the responsibility for responding to inmate grievance forms and keeping the institution’s inmate grievance logs. According to LaPrade’s affidavit and the grievance logs in the record, Plaintiff Trapp never submitted a grievance be *619 tween May 31, 2002 when his necklace was confiscated and June 14, 2002 when he brought suit in court. Therefore, Plaintiff Trapp did not exhaust his administrative remedies before bringing suit in court.

CONCLUSION

Plaintiff Trapp’s confiscated animal tooth necklace is not within the scope of Judge Toomey’s order of May 4, 2000. It is not an approved on-person religious item per DOC regulations and policies. Plaintiff Trapp did not exhaust his administrative remedies before filing suit in court. Accordingly, defendants are entitled to judgment as a matter of law on plaintiff Trapp’s motion for contempt, construed by the court as a complaint for contempt under Mass.R.Civ.P. 65.3.
Plaintiff Wiyakaska’s requested animal tooth necklace is not within the scope of Judge Toomey’s order of May 4, 2000. It is not an approved on-person religious item per DOC regulations and policies. The court is unclear whether plaintiff Wiyakaska exhausted his administrative remedies before filing suit in court. Accordingly, defendants are entitled to judgment as a matter of law on plaintiff Wiyakaska’s motion for contempt, construed by the court as a complaint for contempt under Mass.R.Civ.P. 65.3.

ORDER

For the foregoing reasons, it is hereby ORDERED that the defendants, Lawrence Dubois and other officials of the Massachusetts Department of Correction’s motion to dismiss, considered by the court as a motion for summary judgment under Mass.R.Civ.P. 56. plaintiffs, Randall Shieldwolf Trapp’s and William Wiyakaska a/k/a William Whitefeather Durfee’s motions for contempt of court, considered by the court as complaints for contempt under Mass.R.Civ.P. 65.3, is ALLOWED.

“If on any motion asserting the defense numbered (6), to dismiss for failure to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.” Mass.R.Civ.P. 12(b).
Plaintiffs Trapp and Wiyakaska submitted affidavits and exhibits with their motions for contempt. Likewise defendant DOC submitted affidavits and exhibits with its motion to dismiss. Therefore, the court will consider DOC’s motion to dismiss as a motion for summary judgment under Mass.R.Civ.P. 56.

While each plaintiff filed a Motion for Contempt of Court, the court will constme them as Complaints for Contempt per Mass.R.Civ.P. 65.3.

Defendants also contend that plaintiffs’ pro se complaints for contempt should be dismissed because plaintiffs are represented by counsel. By the hearing on September 27, 2002 plaintiffs’ counsel had formally withdrawn their appearance, so this argument will not be addressed.

The other five plaintiffs were Robert Fish, Rubeti Jett, James Crow Feather Manley, Bernard R. Bailey, Sr. and Christopher Bosquet. All were inmates within the lawful custody of the Massachusetts Department of Correction.

Exhibit G, Plaintiff Wiyakaska’s Motion for Contempt of Court, July 3, 2002.

Page 2 of Exhibit D, Defendants’ Opposition and Motion to Dismiss Plaintiffs Motion for Contempt.

Id.

Page 1 to Exhibit D, Defendants’ Opposition and Motion to Dismiss Plaintiffs Motion for Contempt.

Id.

Exhibit N to Defendants’ Proposed Findings of Fact and Conclusions of Law with Regard to Plaintiff Wiyakaska’s Petition for Contempt.

Exhibit M, “Page 2 of Massachusetts Department of Correction, Religious Services Handbook, as amended April 18, 2000,” attached to Defendants’ Proposed Findings of Fact and Conclusions of Law with Regard to Plaintiff Wiyakaska’s Petition for Contempt.

Id. at Attachment A.

Id. at Attachment B.

Id.

fd.

 103 C.M.R. 491.07.

 103 C.M.R. 491.09.

 Id.

 103 C.M.R. 491.10.

Id.

Exhibit I, Affidavit of Debra LaPrade, July 23, 2002, Defendants’ Motion to Substitute Exhibits with Regard to their July 19, 2002 Opposition and Motion to Dismiss Plaintiffs Motion for Contempt.

Id.

Id. and Exhibit I, Grievance Log, Defendants’ Opposition and Motion to Dismiss Plaintiffs Motion for Contempt.